IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JOHN DENTON MYERS,<br><br>     Plaintiff,<br><br>vs.<br><br>HOG SLAT, INC.,<br><br>     Defendants. | CASE NO. 3:13-cv-03032-DEO<br><br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff John Denton Myers states in support of his Complaint and Jury Demand:

## **INTRODUCTION**

1.      This is an action against Defendant Hog Slat, Inc. ("Hog Slat"), for discriminating against Myers in violation of federal law because of the known disability of his daughter, with whom Myers is associated; for interfering with Myers' continued receipt of health insurance benefits, a right to which he was entitled under Hog Slat's employee benefit plan; for failing to pay Myers commission owed to him; for breach of contract; and for terminating Myers in violation of the public policy of the State of Iowa.

2.      This action is brought to redress Myers' rights under the Americans with Disabilities Act ("ADA"), as amended by the Americans with Disabilities Act Amendments Act ("ADAAA") (both the ADA and the ADAAA shall be hereinafter

referred to collectively as the "ADAAA") (42 U.S.C. §12101 *et seq.*); the Employee

Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. §§ 1101, 1140, *et seq.*);

Iowa's Wage Payment Collection Act (Iowa Code § 91A); and Iowa common law.

3.      Defendant Hog Slat is a covered entity as defined by the ADAAA, 42

U.S.C. § 12111(2) and 42 U.S.C. § 12111(5).

4.      Hog Slat's employee health plan, administered by Blue Cross and Blue

Shield of North Carolina, is an "employee welfare benefit plan" as defined by ERISA, 29

U.S.C. § 1002(1).

## JURISDICTION AND VENUE

5.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 42 U.S.C.

§12101 *et seq.*, and 29 U.S.C. § 1132(e).

6.      This Court has supplemental jurisdiction over Plaintiff's claim under the

Iowa Wage Payment Collection Act (Iowa Code § 91A), Plaintiff's state law wrongful

termination claim, and Plaintiff's breach of contract claims, pursuant to 28 U.S.C. § 1367

7.      The unlawful employment practices described herein were committed

within the State of Iowa in Humboldt County.  Accordingly, venue in this Court is

proper pursuant to 28 U.S.C. § 1391(b).

## PROCEDURAL REQUIREMENTS

8. On April 5, 2013, within 300 days of the date Hog Slat fired him, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Iowa Civil Rights Commission ("ICRC"), alleging that Hot Slat discriminated against him because of his association with a person with a disability.

9. The EEOC issued an Administrative Release/Notice of Right to Sue on June 7, 2013.

## PARTIES

10. Plaintiff John Denton Myers is a resident of Hardy, Humboldt County, Iowa.

11. Defendant Hog Slat is incorporated in the state of North Carolina and does business in the state of Iowa.

12. At all times material, Plaintiff worked out of Hog Slat's Midwest Regional Office in Humboldt, Iowa.

## FACTUAL BACKGROUND

### Myers' Employment with Hog Slat

13. Plaintiff incorporates paragraphs 1-12 as if fully alleged herein.

14. Myers began working for Hog Slat as a sales representative in Hog Slat's Iowa Regional Office in Humboldt, Iowa on or about January 22, 1998.

3

15.     As compensation for his work, Myers received a salary plus commissions, and was also enrolled in Hog Slat's employee health plan through which he received health insurance for himself and his family.

16.     Hog Slat's employee health plan is self-funded. Blue Cross and Blue Shield of North Carolina has served as the administrator of the employee health plan since approximately December 2009.

17.     Myers' job duties from approximately 1998 until Hog Slat fired him in January 2013 focused on securing and servicing "turn-key" contracts for the construction of confinement type and livestock units.

18.     During his employment with Hog Slat, Myers sold hundreds of projects and built relationships with integrators and growers. At the end of his employment, Myers took care of Hog Slat's largest accounts and was the company's go-to "turn-key" salesmen.

19.     Myers entered into a written Employment Agreement with Hog Slat at the time of his hire. That Employment Agreement was revised on April 1, 2010 and remained in effect until further notice. A copy of the Employment Agreement is attached hereto as Exhibit A and incorporated by reference.

20.     The provisions in the Employment Agreement between Myers and Hog Slat included:

a.     A base salary plus sales commission based on all collected sales in Myers' assigned territory and sales to assigned accounts;

4

b.	Additional Hog Slat benefits as outlined in the employee handbook;

c.	Reimbursement for business-related expenses, such as a monthly cell phone allowance, monthly data plan allowance, and monthly home office phone/internet allowance; and

d.	Commissions to which Myers was entitled in the event his employment with Hog Slat was terminated.

21.	Myers and Hog Slat never entered into any other Employment Agreements after April 1, 2010, nor did the parties ever amend or modify the April 1, 2010 Employment Agreement.

## Ava Myers' Disability

22.	On October 14, 2008, Myers' wife Jennifer gave birth to their daughter, Ava.

23.	In approximately June 2009, Ava underwent testing after Myers and Jennifer began to notice developmental delays.  Soon after, Ava underwent an MRI, genetic testing, and eventually received therapy.

24.	Myers' health insurance through Hog Slat's employee health plan paid for most, if not all of, Ava's tests and therapy.

25.	Eventually, Ava was diagnosed with a Mitochondrial Disorder, CoQ10 Enzyme Deficiency and Chromosome 22 Microduplication, and other related conditions, which have left Ava non-verbal, non-ambulatory, and very prone to hospitalization.

5

26.     Beginning in late 2009 or early 2010 and up through 2012, Myers submitted the home medical equipment for Ava listed below to Hog Slat's health insurance plan. Most, but not all, of the listed medical equipment was paid for by the Hog Slat's health insurance plan.

     a.     Stander (price unknown);

     b.     Squiggles Hi-Lo Chair ($6,366.75);

     c.     Advance Bath Seat & Trolley ($1,130.42);

     d.     Gait Trainer ($2,125.00);

     e.     Power Chair ($32,704.83);

     f.     Remote ($3,299.40); and

     g.     Communication System ($17952.00).

27.     In approximately 2010, Myers and Jennifer learned the significance of Ava's needs, i.e. not being able to walk, talk, etc. Up until December 2011, Ava had very few hospitalizations.

28.     Since approximately October 2009, the health insurance that Myers received through Hog Slat's employee health plan covered the following hospitalizations for Ava:

     a.     October/November 2009: University of Iowa Hospitals and Clinics (planned feeding tube placement);

     b.     December 18-20, 2011: Mayo Clinic (unplanned);

     c.     February 2-April 25, 2012: Mayo Clinic (unplanned);

6

d.    June 5-8, 2012:  Mayo Clinic (unplanned);

e.    June 10-14, 2012:  Mayo Clinic (unplanned);

f.    October 13-16, 2012:  Mayo Clinic (unplanned); and

g.    December 6-8, 2012:    Fort Dodge, Iowa Trinity Hospital (unplanned).

29.    Ava's hospitalization at Mayo Clinic from February 2 through April 25, 2012 was Ava's first major hospitalization.

30.    During Ava's hospitalization at Mayo Clinic from February 2 through April 25, 2012, Myers worked from the hospital, out of his home, or on the road. During that time, he was able to sell more barns for Hog Slat than he had ever sold before.

31.    Despite Myers' record sales performance in the first part of 2012, Hog Slat management began to treat Myers different than before.

32.    Starting around the first week of June 2012, Hog Slat's Chief Financial Officer Doug Westfall began to nick pick, harass, and criticize Myers' work performance.  This continued on an almost weekly basis until Myers' termination.  Prior to June 2012, Myers received no negative feedback about his work performance.

33.    In mid-October 2012, National Sales Manager Fritz Richards questioned Myers' commissions, asked Myers whether he thought his compensation was fair, and told Myers that he would think about how to handle Myers' compensation for the year.

Prior to October 2012, no one at Hog Slat ever questioned Myers' income or commissions.

34.     Ava's condition will not improve, and there is a strong possibility that she will require more medical appointments, hospitalizations, and medical equipment as she gets older.

## Changes to Hog Slat's Employee Health Plan

35.     On October 31, 2012, around the time Richards questioned Myers' commissions, Hog Slat's Director of Employee Healthcare Denise Holland sent an e-mail to employees regarding the company's annual open enrollment and changes to Hog Slat's employee health plan and insurance coverage.

36.     Holland's October 31, 2012 stated that health care premium rates were increasing, and that this was "due to an increase in catastrophic claims."

37.     Up to October 31, 2012, Ava had several catastrophic claims, most notably her hospitalization at Mayo Clinic from February 2 through April 25, 2012 that cost over $698,000.

38.     Hog Slat also provided a letter to its employees regarding the company's annual open enrollment and changes to Hog Slat's employee health plan and insurance coverage.   That letter specifically stated, "Our health insurance premiums have increased this year.  This is the first base rate increase in two years and is necessary to offset the high cost of catastrophic medical claims."

## Unpaid Wages and Commissions

39.     On or about January 17, 2013, Myers received an e-mail detailing his quarter commissions, which shorted him about $20,000 of what he earned under Myers' Employment Agreement with Hog Slat.

40.     On or about January 18, 2013, Myers received another e-mail with revised quarterly commission calculations.  Those calculations shorted Myers about $66,000 of what he earned under his Employment Agreement with Hog Slat.

41.     On or about January 18, 2013, Myers sent an e-mail to Hog Slat's controller/office manager Kerry Burmeister, Hog Slat's Midwest sales manager Dale Kenne, Richards, and Westfall asking why his commissions were short $66,000.

42.     On January 21, 2013, Myers and Richards spoke on the phone.  Richards said that as to the commissions Hog Slat had shorted Myers, Hog Slat's mind was made up and that Hog Slat was not going to pay Myers what was owed.  Richards added that Myers should be happy with his income.

43.     Myers responded to Richards by saying that Hog Slat should pay him the commissions he earned and that were due and owing him under the Employment Agreement.

44.     After January 21, 2013, Myers made several unsuccessful attempts to persuade Hog Slat to pay the commissions he earned and were owed to him under the Employment Agreement.

9

45.    On January 24, 2013 Myers met with Kenne and Richards to discuss possible changes Hog Slat wanted to make to Myers' compensation structure. However, neither Myers nor Hog Slat signed a new written sales compensation agreement, nor was the existing Employment Agreement amended or otherwise revised.

46.    On January 25, 2013, Hog Slat made a deposit for commission pay into Myers' bank account that was $66,000 less than the commissions earned and owed to him under the Employment Agreement.

47.    On the morning of January 25, 2013, Myers sent an e-mail to Westfall, Kenne, and Richards regarding the deposit for commission pay.   Myers' e-mail stated:

     a.    That the commission deposited in his account was not the full amount he earned and was owed under his Employment Agreement with Hog Slat;

     b.    That the remaining amount for commission pay due and owing and should be deposited in Myers' account that day; and

     c.    That Hog Slat was unlawfully withholding wages from Myers in violation of the Iowa Wage Payment Collection Act.

<u>Termination</u>

48.    Within minutes of Myers sending the e-mail on January 25, 2103, Hog Slat locked him out of his company e-mail account.

49.     Then, shortly before noon on January 25, 2013, Myers received a telephone call from Kenne, who told Myers that they needed to meet on "neutral ground" and that Myers should bring any Hog Slat property with him to their meeting.

50.     Myers and Kenne met the afternoon of January 25, 2013.  During the January 25, 2013 meeting, Kenne informed Myers that his employment with Hog Slat was terminated.

51.     During the January 25, 2013 termination meeting, Kenne gave Myers several documents to sign.  Myers did not sign the documents, and instead asked if he could take the papers with him and review them.  Kenne said that was fine, but would not let Myers take completed termination form that appeared to contain the purported reasons for Myer's discharge.

52.     On January 28, 2013, Myers had a telephone conversation with Bill Fulton, Hog Slat's head of human resources.  During that telephone call, Myers told Fulton that Kenne handed him a document during the termination meeting, but that Myers did not get a copy.  Fulton explained that the document was a termination form for Myers' file.

53.     During the January 28, 2013 telephone call between Fulton and Myers, Fulton read the termination form to Myers' over the phone, and said that Myers would not be getting a copy of it.  Fulton told Myers that the termination form stated the following:

a.     That Myers could sign a vacation pay form and receive 120 hours of earned vacation;

b.     That Myers was being given severance pay in a lump sum check;

c.     That Myers felt he was owed for commission, and that Hog Slat disagreed.

54.     Myers then asked if the lump sum check was for severance pay or commission owed.  Fulton responded that it was for severance pay.

55.     Hog Slat has not paid the commissions owed to Myers under the written Employment Agreement.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT as amended by the AMERICAN WITH DISABILITIES ACT AMENDMENTS ("ADAAA"),**
**42 U.S.C. §12101 *et seq.***

56.     Plaintiff incorporates paragraphs 1 through 55 of this Complaint as if fully set forth herein.

57.     Plaintiff is protected from disability discrimination by the ADAAA because of the known disability of his daughter Ava with whom Plaintiff has a relationship or association.

58.     Plaintiff's relationship or association with his daughter Ava, who has a known disability, was a motivating factor in the Defendant's conduct, including but not limited to treating the Plaintiff differently as alleged herein, failing to pay the Plaintiff

commissions owed to him under the parties' written sales compensation agreement, and firing Plaintiff.

59.     Defendant's treatment of Plaintiff as set out above constitutes unlawful discrimination against Plaintiff because of his relationship or association with his daughter Ava, who has a known disability.

60.     Defendant's conduct was willful and/or undertaken with disregard for Plaintiff's federally protected rights.

61.     As a proximate result of the Defendant's actions as set forth above, Plaintiff has suffered and will, in the future, suffer emotional distress, mental anguish, pain and suffering, inconvenience, humiliation, loss of the enjoyment of life, medical expenses, and the loss of wages and benefits

62.     Plaintiff requests relief as set forth below.

## COUNT II
## VIOLATION OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974  ("ERISA") (29 U.S.C. § 1140)

63.     Plaintiff incorporates paragraphs 1 through 62 of this Complaint as if fully set forth herein.

64.     Plaintiff was enrolled in and received health insurance benefits for himself and his family through Hog Slat's employee health plan.

65.     One of the requirements for health insurance coverage through Hog Slat's employee health plan is continued employment with Hog Slat.

66.     Under ERISA, 29 U.S.C. § 1140, it is unlawful for any person to interfere with the attainment of any right to which an employee benefit plan participant may become entitled.

67.     When Hog Slat fired Plaintiff on January 25, 2013, it interfered with the attainment of the rights to which Plaintiff was entitled under Hog Slat's employee health plan—Plaintiff's continued receipt of health insurance benefits for himself and his family.

68.     Hog Slat violated ERISA when it fired Plaintiff on January 25, 2013.

69.     Hog Slat's specific intent to interfere with Plaintiff's continued receipt of benefits under Hog Slat's employee health plan was a motivating factor in Hog Slat's decision to fire the Plaintiff.

70.     Hog Slat's decision to fire Plaintiff was a proximate cause of his damages.

71.     Plaintiff has been damaged by Defendant's violations of ERISA and is entitled to legal and equitable relief as determined by the Court, and attorneys' fees and costs.

72.     Plaintiff requests relief as set forth below.

## COUNT III
## VIOLATION OF THE IOWA WAGE PAYMENT COLLECTION ACT
## IOWA CODE § 91A

73.     Plaintiff incorporates paragraphs 1 through 72 above as though fully alleged herein.

14

74.     Plaintiff and Defendant entered into an Employment Agreement, effective April 1, 2010 until further notice, which outlined Plaintiff's compensation including base salary and commission pay.

75.     Iowa Code § 91A.3(1) makes it unlawful for an employer to fail to pay an employee wages owed to the employee.

76.     Iowa Code § 91A.2(7)(a) defines wages as including commissions paid for labor or services rendered by an employee.

77.     Defendant did not pay Plaintiff commissions owed to him under the Employment Agreement.

78.     Defendant intentionally failed to pay Plaintiff wages owed to him under the Employment Agreement.

79.     By reason of Defendant's failure to perform, Plaintiff has incurred expenses and suffered damages.

80.     Plaintiff prays for damages as set forth more specifically below.

**COUNT IV**
**WRONGFUL TERMINATION IN VIOLATION OF THE**
**PUBLIC POLICY OF THE STATE OF IOWA**

81.     Plaintiff incorporates by reference paragraphs 1 through 80 as fully alleged herein.

82.     Plaintiff complained to Defendant that he was not paid commission owed to him the parties' Employment Agreement, and repeatedly attempted to enforce his rights under Iowa Code § 91A.

83.     After Plaintiff complained to Defendant that he was not paid commission owed to him and attempted to enforce his rights under Iowa Code § 91A, Defendant fired Plaintiff.

84.     Plaintiff engaged in statutorily protected activity when he complained to Defendant that he was not paid commission owed to him pursuant to the parties' Employment Agreement, and attempted to enforce his rights under Iowa Code § 91A.

85.     Plaintiff's engagement in the statutorily protected activities described herein was a determining factor in Defendant's decision to fire him.

86.     Defendant's decision to fire Plaintiff was a proximate cause of his damages.

87.     As a result of the Defendant's actions as set forth above, Plaintiff has suffered emotional distress, mental anguish, pain and suffering, inconvenience, humiliation, loss of the enjoyment of life, medical expenses, and lost past and future wages and benefits.

88.     Because Defendant's conduct was willful and wanton, Plaintiff is entitled to punitive damages.

89.     Plaintiff requests relief as set forth in more detail below.

## COUNT V
## BREACH OF CONTRACT

90.     Plaintiff incorporates paragraphs 1 through 89 above as though fully alleged herein.

91.     Plaintiff and Defendant entered into an Employment Agreement, effective April 10, 2010 until further notice.

92.     The Employment Agreement was a valid and enforceable contract between Plaintiff and Defendant.

93.     The Employment Agreement was based on sufficient and valuable consideration.

94.     Defendant failed to perform all of its obligations under the Employment Agreement, including failing to pay Plaintiff commission owed to him.

95.     Plaintiff has performed all of his obligations under the Employment Agreement.

96.     By reason of Defendant's failure to perform, Plaintiff has incurred expenses and suffered damages.

97.     Plaintiff prays for damages as set forth more specifically below.

## RELIEF

Plaintiff respectfully requests the Court grant the following relief:

## COUNT I

A.     Enter a judgment against Defendant for violating Plaintiff's rights under the ADAAA;

B.     Grant equitable relief to ensure that Defendant will not in the future engage in any employment practice which violates the ADAAA;

C.     Order Defendant to make Plaintiff whole by awarding him lost earnings and the value of his lost benefits and order the reinstatement of Plaintiff to his former position or award him front pay in lieu of reinstatement;

D.     Order Defendant to make Plaintiff whole by providing compensation for pecuniary losses including, but not limited to, costs to be incurred for health and life insurance premiums and costs associated with seeking new employment;

E.     Order Defendant to make Plaintiff whole by providing compensation for non-pecuniary losses, including without limitation, emotional distress, mental anguish, pain and suffering, inconvenience, humiliation and the loss of the enjoyment of life;

F.     Award Plaintiff punitive damages against Defendant for acting with malice or reckless indifference in violating the Plaintiff's protected rights under the ADAAA;

G.     Award Plaintiff, against Defendant, a judgment for his reasonable attorney fees and costs pursuant to the ADAAA;

H.     Award pre-judgment interest, against Defendant, as allowed by law; and

I.     Grant such further relief as the Court deems necessary and proper.

## COUNT II

A.     Enter a judgment against Defendant for violating Plaintiff's rights under ERISA;

B.     Grant equitable relief to ensure that Defendant will not in the future engage in any employment practice which violate ERISA;

C.     Order Defendant to make Plaintiff whole by awarding him lost earnings and the value of his lost benefits and order the reinstatement of Plaintiff to his former position or award him front pay in lieu of reinstatement;

D.     Order Defendant to make Plaintiff whole by providing compensation for pecuniary losses including, but not limited to, costs to be incurred for health and life insurance premiums and costs associated with seeking new employment;

E.     Award Plaintiff, against Defendant, a judgment for his reasonable attorney fees and costs pursuant to ERISA;

F.     Award pre-judgment interest, against Defendant, as allowed by law; and

G.     Grant such further legal and equitable relief as the Court deems necessary and proper.

## COUNT III

A.     Enter a judgment against Defendant for violating Plaintiff's rights under Iowa Code Chapter 91A;

B.     Enter an order awarding Plaintiff compensatory damages;

C.     Enter an order awarding Plaintiff liquidated damages;

D.     Award Plaintiff, against Defendant, a judgment for his reasonable attorney fees and costs;

E.     Award pre-judgment interest, against Defendant, as allowed by law; and

F.     Award such further relief as the Court deems necessary and proper.

## COUNT IV:

A.    Order Defendant to make Plaintiff whole by awarding him lost earnings and the value of his lost benefits and order the reinstatement of Plaintiff to his former position or award him front pay in lieu of reinstatement;

B.    Order Defendant to make Plaintiff whole by providing compensation for pecuniary losses including, but not limited to, costs to be incurred for health and life insurance premiums and costs associated with seeking new employment;

C.    Order Defendant to make Plaintiff whole by providing compensation for non-pecuniary losses, including without limitation, emotional distress, mental anguish, pain and suffering, inconvenience, humiliation and the loss of the enjoyment of life;

D.    Award Plaintiff punitive damages against Defendant for acting with malice or reckless indifference in violating the Plaintiff's protected rights;

E.    Award Plaintiff pre-judgment and post-judgment interest as provided by law; and

F.    Award such further relief as the Court deems necessary and proper.

## COUNT V:

A.    Order Defendant to make Plaintiff by awarding him the compensation required under the terms of the Employment Agreement;

B.    Award Plaintiff pre-judgment and post-judgment interest as provided by law; and

C.    Award such further relief as the Court deems necessary and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on Counts I, III, IV, and V of this Complaint.

Respectfully submitted,

/s/ Thomas W. Foley
Thomas W. Foley AT 0002589
Katie Ervin Carlson AT 0008958
Babich Goldman, P.C.
501 S.W. 7th Street, Suite J
Des Moines, Iowa 50309
Telephone: (515) 244-4300
Facsimile: (515) 244-2650
E-Mail: tfoley@babichgoldman.com
E-Mail: kcarlson@babichgoldman.com

ATTORNEYS FOR PLAINTIFF

Original filed.